UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JENNIFER GONZALEZ o/b/o , C.C.

        Plaintiff,

        v.                      **REPORT AND RECOMMENDATION**
                                        **1:07-CV-0487 (GLS)**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

        Defendant,

## I. Introduction

Plaintiff Jennifer Gonzalez on behalf of her son (hereinafter "C.C.") brings this action pursuant to the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security ("Commissioner"), denying his application for child's supplemental security income ("SSI").[2] Specifically, Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") denying C.C.'s application for benefits was not supported by substantial evidence and was contrary to the applicable legal standards. The Commissioner argues that the decision was supported by substantial evidence and made in accordance with the correct legal standards.

For the reasons set forth below, the Court finds the Commissioner's decision was not determined in accordance with the applicable law. Therefore, the Court recommends that the Plaintiff's motion for judgment on the pleadings be granted in part

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.
[2] This case was referred to the undersigned for Report and Recommendation, by the Honorable Norman A. Mordue, pursuant 28 U.S.C. § 636(b)(1)(B), by an Order dated May 8, 2009.

and Defendant's cross-motion for judgment on the pleadings be denied.[3]

## II. Background

On February 24, 2003, Plaintiff, filed an application for CDB on behalf of C.C., who was then 12 years old, claiming disability since August 25, 1999, because of attention deficit hyperactivity disorder ("ADHD"), major depressive disorder ("MDD" or "depression"), neurofibromatosis 1 ("NF-1"),[4] migraines, headaches, and a learning disorder (R. at 46-50, 89).[5] His application was denied initially on July 16, 2003 (R. at 28-29, 33-37). C.C.'s mother filed a timely request for a hearing on September 16, 2003 (R. at 38).

On August 17, 2004, C.C.'s mother, and his attorney appeared before the ALJ (R. at 320-48).The ALJ considered the case *de novo* and, on September 27, 2004, issued a decision finding that C.C. was not disabled (R. at 18-27). On November 24, 2004, Plaintiff requested review of the hearing decision and Plaintiff's attorney requested a transcript and tape of the hearing and an extension of time to submit a brief (R. at 16-17). On January 17, 2006, the Appeals Council granted a 25 day extension and sent tapes of the hearing (R. at 14-15). Because the tapes were inaudible, Plaintiff's attorney requested a new set of tapes (R. at 9). Although Plaintiff's attorney did not received tapes of the hearing, on October 20, 2006, the Appeals Council denied Plaintiff's request for review (R. at 11-13). On December 5, 2006, Plaintiff's attorney

---

[3] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings . . . ." General Order No. 18. (N.D.N.Y. Sept. 12, 2003).

[4] Neurofibromatosis-1 is an inherited disorder, marked by developmental changes in the nervous system, muscles, bones, and skin with café au lait spots, intertriginous freckling, Lisch nodules, and multiple neurofibromas. Dorland's Illustrated Medical Dictionary 1284 (31st ed. 2007)

[5] Citations to the underlying administrative record are designated as "R."

requested that the Appeals Council vacate the decision and remand for a new hearing (R. at 9-10). The Appeals Council set aside their initial decision, considered the arguments raised by Plaintiff's attorney, and again denied Plaintiff's request for review on March 8, 2007 (R. at 4-6). When the Appeals Council denied review, the ALJ's September 27, 2004 decision became the final decision in this case. On May 4, 2007, Plaintiff filed this action disputing the agency's disability determination.

Based on the entire record, the Court recommends remand because the ALJ improperly dismissed C.C.'s diagnosis of NF-1 and his related headaches without recontacting C.C.'s treating physician's to properly develop the record and because the ALJ failed to consider the effects of a structured environment upon C.C.'s functioning.

### III.   Discussion

#### A.  Legal Standard and Scope of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).   "Substantial evidence" is evidence that

amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

A child is considered disabled under the Act if she or he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i). The Commissioner has established the following three-step sequential analysis to determine whether a child is disabled. 20 C.F.R. § 416.924. At

the first step, if the Commissioner determines the claimant is "doing substantial gainful activity," the claimant will be found not disabled. 20 C.F.R. § 416.924(a). If the claimant is not engaging in substantial gainful activity, at the second step the Commissioner will determine whether the claimant has a severe medically determinable impairment or combination of impairments. The Commissioner will determine at step three whether the claimant's impairment or combination of impairments "meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.924(a); see also 20 C.F.R. § 416.924(d).

### B. Analysis

#### 1. The Commissioner's Decision

The ALJ concluded that C.C. was not disabled within the meaning of the Act (R. at 26). At step one, the ALJ concluded that C.C. had never engaged in substantial gainful activity (R. at 26). At step two, the ALJ found that C.C.'s ADHD and depression were medically determinable severe impairments (R. at 24). However, the ALJ found that there was "no definitive evidence" that C.C. suffered from NF-1 and dismissed Plaintiff's claim that C.C.'s headaches and migraines were related to NF-1 (R. at 23-24). At step three, the ALJ found that C.C.'s impairments did not meet, medically equal, or functional equal the Listings (R. at 24-26).

#### 2. Plaintiff's Claims

Plaintiff argues that (a) the ALJ substituted his own opinion for properly submitted medical opinions; (b) the ALJ erred in failing to consider the effects of a structured environment on C.C.; (c) the ALJ erred in finding C.C.'s impairments did not meet

Listing 112.11; and (d) the ALJ erred in finding that C.C.'s impairments did not functionally equal a Listing. Plaintiff's Brief, pp. 17-25.

### a. The ALJ Improperly Dismissed C.C.'s NF-1 Diagnosis

Plaintiff argues that the ALJ erroneously substituted his own opinion for medical opinions of record when he dismissed C.C.'s diagnosis of NF-1 and migraine headaches. Plaintiff's Brief, p. 24, n.24.

At step two, the ALJ must determine whether a child claimant has a medically determinable impairment. 20 C.F.R. § 416.924(c). The regulations require an impairment to "result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. An impairment must further "be established by medical evidence consisting of signs, symptoms, and laboratory findings." Id.; see also 20 C.F.R. §§ 416.928(a)-(c) (defining symptoms as a child claimant's or parent's description of an impairment, signs as abnormalities that can be observed and shown by medically acceptable clinical diagnostic techniques, and laboratory findings as phenomena that can be shown by medically acceptable laboratory diagnostic techniques). However, the ALJ may not make his own diagnosis based upon the signs, symptoms, and laboratory findings of record. Goldthrite v. Astrue, 535 F.Supp.2d 329, 339 (W.D.N.Y. 2008) ("An ALJ must rely on the medical findings contained within the record and cannot make his own diagnosis without substantial medical evidence to support his opinion."); see 20 C.F.R. § 416.927(a)(2) (explaining that diagnoses are medical opinions from physicians or psychologists). Indeed, the Second Circuit has repeatedly warned ALJs from "improperly set[ting] [their] own expertise against that of

the treating physician." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)). In *Rosa*, *Balsamo*, and *Wagner*, the Second Circuit admonished ALJs from requiring particular medical signs to substantiate the treating physicians' diagnoses, when the ALJs "simply [were] not in a position to know whether the absence of [a particular medical sign] would in fact preclude [the physician's diagnosis]." Rosa, 168 FF.3d at 79; see also Balsamo , 142 at 81("[I]t is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . . While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him.") (quoting McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795 (2d Cir. 1983)); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 861 (2d Cir. 1990). Furthermore, the Second Circuit has stated, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 FF.3d at 79 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)).

In this case, the ALJ found "no definitive evidence that the claimant suffers from neurofibromatosis" (R. at 24). The ALJ continued,

> An MRI scan of the brain, performed in March 2000, was normal. Dr. Haller reported in July 2004 that the claimant lacked clinical indicia of the disorder. He recommended further testing, specifically genetic testing, to determine if the claimant was suffering from neurofibromatosis. Absent clinical indicia and diagnostic testing, the [ALJ] finds no evidence of this disorder. There is no indication that this condition, if the claimant does indeed suffer from it, has impacted the claimant adversely. Although the claimant's mother reports that headaches are secondary to this condition, there is no evidence to suggest that they are, in fact, related.

(R. at 24). The ALJ's rejection of C.C.'s NF-1 diagnosis is improper in several respects.

First, the ALJ's rejection of C.C.'s NF-1 diagnosis was improper because "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 FF.3d at 79 (citing Schaal, 134 F.3d at 505). The record before the ALJ consisted of only two office notes from C.C.'s neurologists at Albany Medical College—a May 3, 2001 treatment by Dr. Glenn Castaneda and a July 23, 2004 examination by Dr. Jerome Haller (R. at 117-18, 307). However, the record clearly indicates that C.C. was diagnosed with NF-1 at Albany Medical College and treated there since infancy (R. at 67-68, 326-27). For example, C.C.'s mother indicated that C.C. was treated at Albany by Dr. Cowger and Dr. Weig, whose notes are not in the record, and that he received almost annual check-ups there (R. at 67-70, 328). Although treating pediatrician, Dr. Anthony Malone,[6] saw C.C. more frequently than the specialists at Albany Medical College. Dr. Malone noted that C.C.'s NF-1 condition was monitored by Dr. Weig, the head of child neurology at Albany Medical College (R. at 175, 313). The regulations clearly state that an ALJ "will seek additional evidence or clarification from [a] medical source when the report from [the] source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.912(e)(1). In this case, the evidence received from Albany Medical College was sparse and the ALJ clearly felt that it did not detail the clinical and laboratory diagnostic techniques

---

[6] According to his New York State doctor profile, Dr. Malone is board certified in Developmental-Behavioral Pediatrics and Neurodevelopmental Disabilities . New York State Physician Profile, http://www.nydoctorprofile.com/ (search for Anthony Malone) (last visited September 8, 2009).

underlying the diagnosis. Thus, before rejecting C.C.'s long-standing diagnosis of NF-1 for a lack of "clinical and laboratory diagnostic techniques" the ALJ should have attempted to obtain more complete medical records from Albany Medical College or recontacted Drs. Castaneda and Haller to determine the basis, if any, for C.C.'s NF-1 diagnosis. The failure to do so was error. See Rosa, 168 FF.3d at 79 (citing Schaal, 134 F.3d at 505); 20 C.F.R. § 416.912(e)(1); see also Dundas v. Astrue, 2008 WL 4282621, at *5 (W.D.N.Y. Sept. 16, 2008) (remanding where the ALJ rejected a treating physician's diagnosis because "absolutely no clinical or diagnostic findings" confirmed the diagnosis, but the ALJ failed to recontact the physician for an explanation of the basis for that diagnosis).

      Second, the ALJ appears to be requiring C.C. to have genetic testing, "absent" which, the ALJ would "find[] no evidence of this disorder" (R. at 24). As the Second Circuit has indicated, "as a lay person, the ALJ was simply not in a position to know whether the absence" of a particular medical finding—in this case genetic testing—in fact precludes a diagnosis. See Rosa, 168 F.3d at 79. Moreover, while the regulations require "signs, symptoms, and laboratory findings" to confirm an impairment, the regulations do not empower the ALJ to require a preferred but absent sign, symptom, or laboratory finding. See 20 C.F.R. §§ 416.908, 416.928(a)-(c). Instead, the ALJ must assess the relevant signs, symptoms or laboratory findings presented in the record, seek any necessary additional evidence from a claimant's doctors, or request consultative examinations if the available evidence is insufficient. See 20 C.F.R. §§ 416.912(b)-(f), 416.427(c)(3).

Third, the ALJ's finding that C.C. lacked "clinical indicia" of NF-1 is not supported by substantial evidence because it relies upon a mischaracterization of the record. The ALJ characterized Dr. Haller's comments as evidence that C.C. "lacked clinical indicia" of NF-1 (R. at 24). However, Dr. Haller—a specialist in child neurology—did not reject CC's diagnosis of NF-1. Instead, Dr. Haller examined C.C. on July 23, 2004, and found three *"*café au lait*"* spots and no axillary or inguinal freckling (R. at 307).[7] Dr. Haller noted that C.C. "does not seem to fulfill the cutaneous criteria for NF-1" and therefore recommended "genetic testing to confirm or to eliminate the diagnosis of NF-1" (R. at 307). Notably, the cutaneous criteria to which Dr. Haller referred are not the only basis upon which a physician may diagnose NF-1.[8] Furthermore, on that single occasion when Dr. Haller examined C.C., he noted that C.C.'s previous medical records were not available for review. Thus, the original basis for C.C.'s diagnosis was not available to Dr. Haller, nor could he determine whether C.C. had previously undergone genetic or other relevant testing. Indeed, other evidence of record contradicts the ALJ's conclusion that C.C. does not have NF-1. Dr. Malone examined C.C. many times over a period of years and on January 12, 2001, found "multiple [café-au-lait spots], including axillary freckle;" on February 22, 2001, found a lump on C.C.'s neck that may have been a

---

[7] The Court notes that NF-1 is typically diagnosed based on the presence of two or more of the following criteria: (1) six or more light brown spots on the skin (often called "café-au-lait" spots), measuring more than 5 millimeters in diameter in children or more than 15 millimeters across in adolescents and adults; (2) two or more neurofibromas, or one plexiform neurofibroma (a neurofibroma that involves many nerves); (3) freckling in the area of the armpit or the groin; (4) two or more growths on the iris of the eye (known as Lisch nodules or iris hamartomas); (5) a tumor on the optic nerve (called an optic nerve glioma); (6) abnormal development of the spine (scoliosis), the temple (sphenoid) bone of the skull, or the tibia (one of the long bones of the shin); and (7) a parent, sibling, or child with NF1. National Institutes of Health, Neurofibromatosis Fact Sheet, http://www.ninds.nih.gov/disorders/neurofibromatosis/detail_neurofibromatosis.htm#toc (last visited September 8, 2009).

[8] See National Institutes of Health, Neurofibromatosis Fact Sheet, http://www.ninds.nih.gov/disorders/neurofibromatosis/detail_neurofibromatosis.htm#toc (last visited September 8, 2009).

neurofibroma; and on September 30, 2003, found a questionable lump in the right mandibular area and multiple café-au-lait spots (R. at 116, 121-22, 168-80, 312-19). Similarly, C.C. was examined by Dr. Castaneda, another child neurologist at Albany Medical College, on May 3, 2001 (R. at 117-18). Dr. Castaneda did not question C.C.'s NF-1 diagnosis, but instead focused on treating the symptoms of NF-1, namely C.C.'s headaches—both mild headaches and migraines—and his ADHD (R. at 117).Ultimately, Dr. Castaneda switched C.C. from Adderall to Concerta and prescribed Periactin for headaches and Maxalt as rescue medication for migraines (R. at 118). Finally, C.C.'s mother testified that he was initially diagnosed with NF-1 as an infant, when he presented with premature growth of pubic hair (R. at 67, 83, 326). To the extent that the ALJ's statement that C.C. lacked the clinical indicia of NF-1 relied on Dr. Haller's comment, the ALJ mischaracterized the evidence, and to the extent he relied on the remaining evidence of record he is contradicted by Dr. Malone's findings, Dr. Castandea's treatment, and Plaintiff's testimony.[9] Ultimately, this conclusion is flawed by the ALJ's failure to develop the record from Albany Medical College as discussed above.

Finally, the Court notes that in dismissing C.C.'s NF-1 diagnosis, the ALJ also dismissed C.C.'s headache and migraine symptoms. The ALJ rejected C.C.'s claims of frequent headaches and migraines because there was no evidence to suggest that the headaches were secondary to NF-1 other than his mother's statements (R. at 24).

---

[9] Similarly, the Court notes that the ALJ refers to C.C.'s "normal" March 2000 MRI scan, as if it were laboratory evidence that C.C. did not suffer from NF-1. However, an MRI scan is not strictly speaking a diagnostic indicator of NF-1, but rather a routine method of monitoring for brain tumors, which may occur in patients with NF-1 or NF-2. See (R. at 83); National Institutes of Health, Neurofibromatosis Fact Sheet, http://www.ninds.nih.gov/disorders/neurofibromatosis/detail_neurofibromatosis.htm#toc (last visited September 8, 2009).

There is some evidence in the record that C.C.'s headaches and ADHD are secondary to his NF-1—namely that Dr. Castaneda focused his treatment on C.C.'s headaches, migraines, and ADHD (R. at 117-18). Moreover, the National Institutes of Health describes both headaches and ADHD as common symptoms or conditions associated with NF-1.[10] However, if the ALJ doubted the association, he should have recontacted C.C.'s neurologists for clarification. See 20 C.F.R. § 416.912(e)(1) (directing ALJs to seek clarification from a medical source when a "report does not contain all the necessary information"). Moreover, by rejecting C.C.'s NF-1 diagnosis and evidence of C.C.'s migraines and headaches, the ALJ improperly failed to consider the effects of those impairments in the remainder of his sequential analysis. See 20 C.F.R. § 416.924(a) (explaining that the Commissioner will consider the combined effect of all impairments on a child's functioning).

### b. The ALJ Did Not Consider the Effects of a Structured Setting on C.C.'s Functioning

Plaintiff further argues that the ALJ's decision fails to consider the effects of a structured setting on C.C.'s functioning, as required by the 20 C.F.R. § 416.924a(b)(5)(iv) and case law. Plaintiff's Brief, pp. 24-25.

The regulations require the ALJ to consider a number of relevant factors in evaluating the effects of impairments on a child's functioning. See 20 C.F.R. § 416.924a(b)(1)-(9). One factor is "the effects of structured or supportive settings." 20 C.F.R. § 416.924a(b)(5). The regulations recognize that a "special classroom" may be a "structured or supportive setting." 20 C.F.R. § 416.924a(b)(5)(iv)(B). Because such a

---

[10] National Institutes of Health, Neurofibromatosis Fact Sheet, http://www.ninds.nih.gov/disorders/neurofibromatosis/detail_neurofibromatosis.htm#toc (last visited September 8, 2009).

"structured or supportive setting may minimize signs and symptoms of [a child's] impairment[] and help to improve [a child's] functioning," the ALJ "will consider" the child's "need for a structured setting and the degree of limitation in functioning [the child] [has] or would have outside the structured setting." 20 C.F.R. § 416.924a(b)(5)(iv)(C).

> [I]f [a child's] symptoms or signs are controlled or reduced in a structured setting, [the ALJ] will consider how well [the child] [is] functioning in the setting and the nature of the setting in which [the child] [is] functioning (e.g., home or a special class); the amount of help [the child] need[s] from [his] parents, teachers, or others to function as well as [the child] do[es]; adjustments [the child] make[s] to structure [his] environment; and how [the child] would function without the structured or supportive setting.

20 C.F.R. § 416.924a(b)(5)(iv)(E). While the regulations only require an ALJ to consider, not necessarily discuss, the effects of a structured setting, Courts have remanded when it is evident that an ALJ did not even consider the factor. McClain v. Barnhart, 299 F.Supp.2d 309, 326 (S.D.N.Y. 2004) (finding the ALJ's conclusion that the child claimant had a less than marked limitation in interacting and relating to others was unsupported by substantial evidence in part because the ALJ failed to consider that the child's improvements in behavior occurred only in the structured setting of a special education class); Thompson v. Barnhart, 2004 WL 896663, at *7 (E.D.N.Y. Mar. 26, 2004) (noting that the ALJ failed to consider the child's functioning outside a structured setting where the ALJ specifically relied upon evidence that the child "responded well to the structured milieu"); see also Watson ex rel. K.L.W. v. Astrue, 2008 WL 3200240, at *4-5 (W.D.N.Y. Aug. 5, 2008) (finding that the ALJ did not err because he considered the child claimant's functional capacity outside structured settings).

In this case, the ALJ considered C.C.'s school setting but mistakenly believed

13

that C.C. was "mainstreamed in core subjects" (R. at 25). To the contrary, the record shows that C.C. has been in "self-contained" special education classes for his "core subjects" since at least fifth grade (R. at 99, 224-27, 247, 251, 254, 264, 268-70). Testing and evaluation of C.C. revealed he "requires a small, highly structured classroom environment" (R. at 162). Indeed, a 2004 review of C.C.'s educational needs recommended that he be placed in an even smaller and more highly supportive setting (R. at 160-67). Where C.C. had previously been in core classes with no more than fifteen other students (R. at 99, 234, 268-69, 345), based upon his new recommendations, C.C. would be in a class with no more than nine other students and three teachers or support staff (R. at 163-64, 274-81). Because the ALJ failed to accurately identify the nature of C.C.'s structured setting and the amount of help C.C. was receiving, this Court concludes that the ALJ did not consider the effects of a structured environment on CC's functioning. See 20 C.F.R. §§ 416.924a(b), 416.924a(b)(5)(iv)(A)-(E). On remand the ALJ must consider the nature of CC's self-contained special education classes and the amount of help he receives to assess how he would function outside the structured setting. See 20 C.F.R. § 416.924a(b)(5)(iv)(E); see also 20 C.F.R. § 416.924(a) (requiring the Commissioner to consider all relevant factors from § 416.924a when assessing a child's functioning "at any step").

### c. ALJ Failed to Provide a Sufficient Rationale for Finding CC's Impairments Did Not Meet Listing 112.11

Plaintiff argues that the ALJ erred in failing to "set forth a sufficient rationale" to support his finding that C.C. did not meet a listed impairment. Instead "[t]he ALJ made a cursory finding." Plaintiff's Brief, p. 17. Defendant argues that substantial evidence

supports the ALJ's conclusion that C.C. did not meet Listing 112.11. Defendant's Brief, pp. 6-11.

The ALJ's failure to recontact C.C.'s treating physicians, to properly consider C.C.'s NF-1 and headaches, and to consider the effects of a structured environment have rendered the ALJ's remaining analysis unsubstantiated. See 20 C.F.R. § 416.924(a) (requiring the Commissioner to consider the combined effects of a child's impairments and relevant factors, such as the effect of a structured environment, "at any step" when assessing a child's functioning). Nonetheless, the Court notes that on remand the ALJ should sufficiently explain his findings with respect to whether C.C.'s impairments meet or equal a Listing.

In this case, the ALJ found C.C. suffered from ADHD and depression and concluded: "However, said impairments fail to meet or equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of Social Security Regulations No. 4" (R. at 24). This single sentence constitutes the ALJ's entire analysis of whether CC's impairments met or equaled a Listing. On remand the ALJ must provide a sufficient rationale, not merely a cursory conclusion. See Hunt v. Astrue, 2008 L 3836406, at *10 (N.D.N.Y. Aug. 13, 2008) (finding the ALJ "failed to provide a sufficient rationale" where he "cited no medical evidence and provided very little reasoning"); Ramos v. Barnhart, 2003 WL 2102012 at *9-10 (S.D.N.Y. May 6, 2003) (finding the ALJ's conclusory statement that a child's impairments "neither met to medically equaled" was "insufficient" and remanding because the ALJ "failed to set forth any rationale . . . let alone a 'sufficient' one"); Colon v. Apfel, 133 F.Supp.2d 330, 343 (S.D.N.Y. 2001) ("Conclusory findings without explanation and analysis have little or no

value.").

Courts have repeatedly required an ALJ's decisions to "contain a sufficient explanation of his reasoning to permit the reviewing court to judge the adequacy of his conclusions." Riveria v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991) (citing Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir.1988); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984); Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir.1982)). In *Berry v. Schweiker*, the Second Circuit allowed that a Court may uphold an ALJ's implicit determination that a claimant does not meet a Listing, if the Court is "able to look to other portions of the ALJ's decision and to clearly credible evidence" to find substantial evidence supports the determination. 675 F.2d at 469. However, the Second Circuit carefully excluded those cases "in which [a Court] would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." Id. In those cases, a court should "not hesitate to remand the case for further findings or a clearer explanation for the decision." Id. Ultimately, the Second Circuit admonished the Commissioner, "in future cases" based upon a Listing, he "should set forth a sufficient rationale in support of his decision to find or not find a listed impairment." Id. Similarly, this Court concludes that upon remand ALJ must provide a "sufficient rationale" for his conclusion that C.C. does or does not meet a listed impairment.

### d. The ALJ's Remaining Analysis Was Necessarily Flawed

Plaintiff has also argued that C.C.'s limitations functionally equaled the severity of a Listed impairment. Plaintiff's Brief, pp. 20-24. However, because the ALJ did not properly consider the effects of C.C.'s structured school environment, or recontact

16

C.C.'s treating physicians, and therefore properly consider C.C.'s NF-1 impairment and headaches, his analysis of the functional effects of C.C.'s impairments was necessarily flawed. See 20 C.F.R. § 416.924(a).

## IV.    Conclusion

Based on the foregoing, the Court recommends that the Commissioner's decision denying disability benefits be REMANDED pursuant to sentence four of 42 U.S.C. Section 405(g) for further proceedings in accordance with this recommendation.

Victor E. Bianchini
United States Magistrate Judge

DATED: October 2, 2009

Syracuse, New York

## Orders

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

**SO ORDERED**.

Victor E. Bianchini
United States Magistrate Judge

DATED: October 2, 2009

Syracuse, New York